IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01022-RMR-NRN

STEVEN NICHOLS, individually and on behalf of all others similarly situated,

Plaintiff,

v.

GOOGLE LLC,

Defendant.

---

**REPORT AND RECOMMENDATION ON
DEFENDANT GOOGLE LLC'S MOTION TO COMPEL ARBITRATION AND STAY
(Dkt. #7)**

---

**N. REID NEUREITER**
**United States Magistrate Judge**

This matter is before the Court on an Order (Dkt. #8) referring Defendant Google LLC's ("Google") Motion to Compel Arbitration and Stay. (Dkt. #7.) Plaintiff Steven Nichols responded to the motion on June 28, 2023. (Dkt. #13.) Google filed its reply in support on July 12, 2023. (Dkt. #15.)

The Court heard argument from the parties on July 27, 2023. (*See* Dkt. #16.) The Court has taken judicial notice of the Court's file and considered the applicable Federal Rules of Civil Procedure and case law. Now being fully informed and for the reasons discussed below, the Court **RECOMMENDS** that the Motion to Compel Arbitration and Stay (Dkt. #7) be **GRANTED.**

## BACKGROUND

In this putative class action, Mr. Nichols alleges that Google sells the Pixel 4a, Pixel 5, and Pixel 5a mobile phones, which Google advertises as being capable of accessing 5G broadband networks. However, Mr. Nichols contends that a recent software update rendered the phones unable to access such networks. Mr. Nichols alleges that he purchased a Pixel 5 phone in October 2020, and appears to allege that he owned at least one additional Pixel 5 phone, believing that the devices could access 5G networks. He alleges he would not have paid as much for the phones had he known that they would not remain capable of accessing such networks.

Mr. Nichols contends that Google's conduct amounts to false or deceptive advertising in violation of the Colorado Consumer Protection Act as well as other states' consumer fraud acts. He also brings claims for breach of contract, breach of express and implied warranties, negligent misrepresentation, fraud, and unjust enrichment. (*See* Dkt. #1.)

Google argues that Mr. Nichols entered into an arbitration agreement whereby he agreed to arbitrate all disputes with Google on an individual basis, that the lawsuit cannot proceed in federal court, and that Mr. Nichols must be compelled to arbitrate.

Specifically, Google argues that as part of the Pixel 5 set-up process, all users are notified that the device is subject to the Google Device Arbitration Agreement (the "Arbitration Agreement.")[1] three times. (Dkt. ## 7 at 3–4; 7-1 at ¶¶ 4–9.) First, a

---

[1] A complete copy of the Arbitration Agreement can be found at Dkt. #7-2. The Court may properly "consider the Terms and Conditions submitted by defendant in determining whether there is a valid and enforceable agreement to arbitrate." *BigBen 1613, LLC v. Belcaro Grp., Inc.*, No. 17- cv-00272-PAB-STV, 2018 WL 4257321, at *3 (D. Colo. Sept. 6, 2018). Additionally, Google has submitted the declaration of Victoria

conspicuous notice on the exterior of the Pixel 5 box notifies consumers of the Arbitration Agreement when unboxing the device: "Requires: Google Account, internet access, and or/ paid subscription for some features; acceptance of arbitration terms, see g.co/devicearbitration." (Dkt. #7-1 at ¶ 4.) Second, a printed notice inside the box informs the user that the Pixel 5 is subject to the Arbitration Agreement. (*Id.* at ¶ 5.) Third, Pixel 5 users are again notified of the Arbitration Agreement during device setup, a process they must go through in order to use the device. (Dkt. #7 at 4.) Users are shown a screen titled "Additional legal terms" in an easily legible font that informs them that they agree to the Arbitration Agreement when they select a brightly colored "I accept" button. (Dkt. #7-1 at ¶ 7.) Users are also notified that "[a]ll disputes regarding your Google device will be resolved through binding arbitration on an individual, non-class basis, as described in the Google Device Arbitration Agreement, unless you opt out by following the instructions in the Arbitration Agreement." (*Id.*) The Arbitration Agreement states that users have 30 days from when a user first activates their device to opt out of the Arbitration Agreement, either by returning the device or by "notifying Google . . . by following the instructions at g.co/devicearbitration/optout." (Dkt. #7-2 at ¶ 9.) This Uniform Resource Locator ("URL") instructs users who wish to opt out of the Arbitration Agreement to input the serial number of their Pixel device and the email

---

Luu, a Legal Specialist on the Devices team for Google, in support of its Motion to Compel Arbitration and Stay. (*See generally* Dkt. #7-1.) Plaintiff has not contested the content of this declaration. The Court may properly consider this declaration when ruling on the Motion to Compel Arbitration and Stay. *See Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1264 (10th Cir. 2012).

address used to activate the device, and to click a bright blue "Submit" button. (Dkt. #7-1 at ¶ 21.)

According to Google, Mr. Nichols accepted the Arbitration Agreement by clicking "I accept" on October 29, 2020, and again in October and November 2022 when setting up a second and third Pixel 5 device. (Dkt. #7 at 6–7.) At no point did Mr. Nichols opt out of the Arbitration Agreement. (Dkt. #7-1 at ¶ 22.)

For his part, Mr. Nichols argues that the Arbitration Agreement is not enforceable. He contends that the "Additional legal terms" screen that Google displays for users during the device set up process contains ambiguous language, making it unclear whether Mr. Nichols was agreeing to arbitration or opting out of arbitration by pressing the "I accept" button on the screen. (Dkt. #13 at 3.) He further argues that the URL containing opt-out instructions was buried deep within the Arbitration Agreement. (*Id.* at 5.) Mr. Nichols also argues that he was fraudulently induced to accept the Arbitration Agreement because the Arbitration Agreement misrepresented the benefits of arbitration as opposed to litigation. (*See id.* at 5–6.)

## LEGAL STANDARDS

There is no dispute that the Arbitration Agreement in this case is subject to and governed by the Federal Arbitration Act, 9 U.S.C. §§ 1–14 ("FAA"). Under the FAA, agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The United States Supreme Court has "long recognized and enforced a liberal federal policy favoring arbitration agreements," and accordingly, any "doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Nat'l Am. Ins. Co. v. SCOR*

4

*Reinsurance Co.*, 362 F.3d 1288, 1290 (10th Cir. 2004) (quoting *Howsam v. Dean Witter Reynalds, Inc.*, 537 U.S. 79, 83 (2002), and *Spahr v. Secco*, 330 F.3d 1266, 1269–70 (10th Cir. 2003)).

Motions to compel arbitration are governed by 9 U.S.C. § 4, which provides in relevant part:

> The court shall hear the parties, and *upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue*, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . . If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.

9 U.S.C. § 4 (emphasis added). Therefore, if the "making" of an agreement for arbitration is in question, judicial resolution of that issue is required. *Spahr*, 330 F.3d at 1269–70 (citing *Prima Paint Corp. v. Flood & Conklin Mfg.*, 388 U.S. 395, 403–04 (1967)); *see also Bess v. Check Express*, 294 F.3d 1298, 1304 (11th Cir. 2002) ("If 'the making of the arbitration agreement' is in issue . . . the court must first adjudicate whether the agreement is enforceable against the parties."). "The party moving to compel arbitration must present 'evidence sufficient to demonstrate the existence of an enforceable agreement.'" *Hickerson v. Pool Corp.*, No. 19-cv-02229-CMA-STV, 2020 WL 5016938, at *3 (D. Colo. Aug. 25, 2020) (quoting *Bellman v. i3Carbon, LLC*, 563 F. App'x 608, 612 (10th Cir. 2014)).

If the Court finds that a valid arbitration agreement exists, it must then determine whether the dispute falls within the scope of the agreement. *Pikes Peak Nephrology Assocs., P.C. v. Total Renal Case, Inc.*, No. 09-cv-00928-CMA-MEH, 2010 WL 1348326, at *5 (D. Colo. Mar. 30, 2010). A claim is arbitrable if it has "a reasonable

5

factual connection to the contract." *Brown v. AutoNation Chrysler Dodge Jeep Ram Sw.*, No. 21-CV-00897-MEH, 2021 WL 2514524, at *2 (D. Colo. June 18, 2021) (quoting *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1516 (10th Cir. 1995)). Once a court concludes a valid arbitration agreement exists, the FAA mandates a stay of a judicial proceeding "upon any issue referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3; *see also Am. Family Mut. Ins. Co. v. TAMKO Bldg. Prods.*, 178 F. Supp. 3d 1121, 1129 (D. Colo. 2016).

## ANALYSIS

The Court finds that the Arbitration Agreement is valid and enforceable. Concerning the first prong of the analysis, "[t]he existence of an agreement to arbitrate 'is simply a matter of contract between the parties; [arbitration] is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration.'" *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1283 (10th Cir. 1997) (quoting *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943–45 (1995)).

"Generally, courts should apply ordinary state-law principles that govern the formation of contracts to determine whether a party has agreed to arbitrate a dispute." *Vernon*, 857 F. Supp. 2d 1135, 1149 (D. Colo. 2012), *aff'd*, 925 F. Supp. 2d 1185 (D. Colo. 2013). Mr. Nichols does not expressly argue which state's law governs the arbitrability of his claims, but relies almost exclusively on case law from the District of Colorado and Tenth Circuit Court of Appeals. The Arbitration Agreement itself contains a California choice-of-law provision. (*See* Dkt. #7-2 at 3.) Google argues, and the Court agrees, that because neither party has identified an outcome-determinative conflict between Colorado law and California law as to contract formation, this Court may apply

6

Colorado law at this stage. (*See* Dkt. #15 at 3 n.2 (citing *Fuentes v. Dish Network L.L.C.*, No. 16-cv-02001-JSW, 2016 WL 11752207, at *5 (N.D. Cal. Oct. 13, 2016) ("The Court concludes it need not resolve the choice of law dispute on questions of [contract] formation, because under either California law or Colorado law, the outcome is the same.").)

Mr. Nichols contends that the Arbitration Agreement is unenforceable because ambiguous and confusing language on the "Additional legal terms" screen meant that there was no "meeting of the minds" or mutual assent between Mr. Nichols and Google, and thus no contract formation. (Dkt. #13 at 3–4.) Specifically, Mr. Nichols argues that the page was unclear as to whether the act of clicking the "I accept" button meant that he was agreeing to or opting out of arbitration. (*Id.*) This argument is unpersuasive.

"In determining whether a contract existed between the parties, 'evidence of the parties' conduct, their oral statements and their writings, and other evidence illuminating the circumstances surrounding the making of an agreement are admissible to clarify the intent and purpose of the parties.'" *Vernon*, 857 F. Supp. 2d at 1149 (quoting *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 888 (Colo. 1986)). However, "[a]n objective manifestation of assent is not rebutted by that same party's uncommunicated, subjective intent." *Id.* (quoting *Avemco Insurance Co. v. N. Colo. Air Charter, Inc.*, 38 P.3d 555, 559 (Colo. 2002)).

The evidence in this case demonstrates that Mr. Nichols manifested his assent to the Arbitration Agreement twice: first when he clicked "I accept" to the clickwrap[2]

---

[2] "Consumers may be presented with a 'clickwrap' or 'click-through' agreement in which the internet purchaser is required to affirmatively click an 'I agree' box after being presented with a list of terms and conditions of use." *Vernon*, 857 F. Supp. 2d at 1149.

7

agreement during set up of his devices, and again when he did not timely opt-out. Courts have held that clicking "accept" to the terms of a clickwrap agreement, even when the terms do not appear on the same screen as the "accept" button but are available with the use of a hyperlink, is sufficient to form a contract. *See id* at 1150–51; *see also Hancock*, 701 F.3d at 1257–58 (holding clickwrap agreement valid and enforceable); *Health Grades, Inc. v. Hamot Med. Cent.*, No. 05-cv-02163-REB-MEH, 2006 WL 8454634, at *3 (D. Colo. Feb. 27, 2006) (finding clickwrap agreement binding and collecting cases from other jurisdictions finding the same). The terms must be "sufficiently conspicuous as to permit a reasonable user the opportunity to review them and either agree to them or to cancel the . . . service." *Grosvenor v. Qwest Corp.*, 854 F. Supp. 2d 1021, 1030 (D. Colo. 2012).

      Here, as described above, Mr. Nichols was informed of the existence of the Arbitration Agreement at least three times. The notice during the set-up process specifically explained: "All disputes regarding your Google device will be resolved through **binding arbitration** on an individual, non-class basis, as described in the Google Device Arbitration Agreement, unless you opt out by following the instructions in the Arbitration Agreement." (Dkt. ## 7 at 5, 7-1 at ¶ 7 (emphasis in original).) The Arbitration Agreement (which was hyperlinked in the aforementioned notice) is relatively short, with only eleven paragraphs over three pages. (Dkt. #7-2.) As described above, Section 9 of the Arbitration Agreement plainly sets forth the opt-out procedure. (Dkt. #7-2 at 2–3.)

Mr. Nichols points to no specific ambiguity in this process, and the Court finds none. Mr. Nichols affirmatively assented to the Arbitration Agreement by clicking "I accept," and he never subsequently opted out.[3]

The Court also rejects Mr. Nichols' argument that he was fraudulently induced into accepting the Arbitration Agreement. (See Dkt. #13 at 5–6.) Mr. Nichols has not alleged with particularity (as required by Fed. R. Civ. P. 9(b)) that his assent to the Arbitration Agreement "was the product of fraud or coercion." *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 960 (10th Cir. 1992) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974)). Mr. Nichols argues that three statements in the Arbitration Agreement were fraudulent. First, Mr. Nichols alleges that the Arbitration Agreement "describe[es] arbitration as 'the quickest and most cost-effective way' to resolve disputes" (Dkt. #13 at 5), but the Arbitration Agreement in actuality states that "[i]t's in both of [the parties'] interests to resolve disputes in the quickest and most cost-effective way." (Dkt. #7-2 at ¶ 1.) Second, Mr. Nichols alleges that the statement that "[a]rbitration . . . uses a neutral arbitrator instead of a judge or jury" was fraudulent. (*Id.*) Mr. Nichols argues that this statement "mischaracterizes the role of a judge and jury" (Dkt. #13 at 6) but does not explain why. Mr. Nichols lastly argues that because the Arbitration Agreement contains a provision preventing class actions (*see* Dkt. #7-2 at ¶ 6), the statement that "arbitrators can award the same damages and remedies that a court can award" is false. (*Id.*) The fact that the Arbitration Agreement

---

[3] Moreover, the Northern District of California has already considered the same Arbitration Agreement at issue in this case and found that it was enforceable. *McCoy v. Google, LLC*, No. 20-cv-05427-SVK, 2021 WL 6882419, at *3 (N.D. Cal. Nov. 9, 2021).

contains a contractual provision preventing class actions is unrelated to a general statement regarding the powers of arbitrators. Further, as a general matter, it is not fraudulent for a party to express a preference for arbitration over traditional litigation, particularly considering public policy favoring arbitration for dispute resolution. *Vernon*, 857 F. Supp. 2d at 1142.

Finally, there appears to be no dispute that the Arbitration Agreement applies to disputes related to "device(s), related accessories or related subscription services" for the Pixel 5 phone, or that 5G network access falls within the scope of the Arbitration Agreement. Because the Arbitration Agreement is valid and Mr. Nichols' claims are within the scope of that agreement, Mr. Nichols must be compelled to arbitrate.

## CONCLUSION

For the reasons set forth above, it is hereby **RECOMMENDED** that the Motion to Compel Arbitration and Stay (Dkt. #7) be **GRANTED**.

**NOTICE: Pursuant to 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case. A party may respond to another party's objections within fourteen (14) days after being served with a copy. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file and serve such written, specific objections waives de novo review of the recommendation by the District Judge,** *Thomas v. Arn*, **474 U.S. 140, 148–53 (1985), and also waives appellate review of both factual and legal questions.**

*Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412–13 (10th Cir. 1996).

Dated at Denver, Colorado this 12th day of September, 2023

_____
N. Reid Neureiter
United States Magistrate Judge